Charles Cooper, Jr.  Good morning, Your Honors, and may it please the Court. My name is Daniel Hill, and I represent, by special appointment, Mr. Cooper in this matter. Just for the purposes of oral argument, Mr. Cooper wrote his own briefs. And if I may reserve about five minutes on rebuttal, and I'll watch my own time. There's a couple of issues that need to be addressed, or I think would benefit being addressed before the Court. First, whether Nevada robbery qualifies as a violent felony under the ACCA. That's kind of a big one. And then the second one is the Payton violation and whether that confession resultant should have been admitted at trial. So we'll start with the ACCA. This Court instructed the parties to be prepared to discuss Edling, which the Circuit delivered a couple of days ago, and what impact, if any, it has. It does narrow our focus down quite a bit in the following way. The government argues that Nevada robbery is a violent felony under either A, the force clause of the ACCA, or B, the enumerated clause under the ACCA. Between the guidelines, which was what the Edling decision addressed, the crime of violence under the guidelines, the force clause there and the force clause in the ACCA are identical. Edling instructed that Nevada robbery is not a crime of violence under the force clause. I think that narrows our exploration of the issue down to simply, is Nevada state robbery a categorical match under the enumerated clause? Now, the ACCA's enumerated clause is much more limited than the guidelines clause because robbery is not one of the enumerated offenses. That leaves us with extortion. So what is the narrow issue before the Court after Edling is this. The guidelines has a 2016 amendment that specifically lays out what extortion is. The ACCA does not. So we're dealing with the common law or generic extortion, which this Court set forth and Bessarol-Lopez cited in the briefs as follows. Obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats. The guideline version specified that it had to be against a person. The ACCA does not. So where does that leave us? Edling also gave us a little guidance on how the analysis should go. Edling tells us to consider whether the least of the acts criminalized in the Nevada robbery statute is a categorical match. The 1983 Nevada robbery statute is cited on page 9 of the amicus brief. It's 10 miles long. I won't go through the whole thing. But it will zero in on is why Mr. Cooper represents that it encompasses a wider swath of conduct than the generic or common law extortion, specifically as follows. The Nevada robbery statute proscribes using the force or fear to obtain or to retain property. And, you know, simple statutory construction says those mean different things because the authors of the statute put them both in there. So it's to obtain or retain possession of property. It specifies that the degree of force is immaterial. And then finally it has this curious language at the end that says, although the taking was fully completed without the knowledge of the person from whom taken, such knowledge was prevented by use of force or fear. So what does that mean? Under the statute, obtain so let's boil it down this way. What is the least of the acts criminalized by the Nevada robbery statute? Retaining someone's property by instilling the fear of injury to property without the knowledge of the person that the property is retained. That's the least of the acts criminalized under the Nevada robbery statute. Bessara-Lopez further advises from there we can look at one of two ways of that statute. A, is there a realistic probability that the State would apply the statute to conduct broader than the categorical correlative, or that the text expressly includes broader range of conduct? So I cooked up a scenario that I asked the Court to indulge me in. Imagine a boyfriend and a girlfriend break up. They are living together. Girlfriend leaves the house. Okay? She comes back a few days later and she demands her stuff. Boyfriend throws it kind of out into the driveway, but not all of it. She gathers it up, looks at it, looks like all of it, puts it in her car, and he pulls out a knife. Boyfriend says, if you don't get out of here, I'm going to slash your tires. She takes off. A couple of days later, she's calmed down. She realized she didn't get all of her stuff back. She left because of a threat to her property. Under the Nevada statute, that's robbery. He retained property that he did not obtain or take by force, but he retained it by threatening the property of another. And she didn't know that some of it wasn't going with her. And the reason she didn't know it was because there was a threat. Now, that is robbery under the Nevada statute. Kennedy. My only question is the Supreme Court has said that we should be wary of hypotheticals that get too abstract. And I agree that's a clever and certainly an on-point analogy. I'm just wondering whether that has gotten to the point where the Supreme Court says we, those peripheries, we can't worry too much about them. Well, there's two ways to go to skin this cat, Your Honor. One of them is a realistic probability. Okay. Your Honors might not agree that that's a realistic probability. Or the text expressly includes a broader range of conduct. The fact scenario I just presented, it's within the express language of the statute. Retaining property without the knowledge of the person. You cannot extort someone of property without them knowing that they – it says right in the common law extortion, with the person's consent. Now, this Court has certainly indicated that without an unwillful under robbery and without consent are not contrary to one another. However, you can't do it with your consent and not know that you've turned over the property. So on the one hand, we're talking about retaining property instead of what the common law extortion says, which is obtaining. And then we're talking about without someone's knowledge, which, going back to Becero Lopez, which dealt with the California robbery statute, let's just take a quick look at it. The taking of personal property, just taking, in the possession of another, from his person or immediate presence and against his will, accomplished by any means of force or fear. Now, that, this Court determined, was a categorical match with common law extortion. Well, it's so much more narrow than the Nevada statute. It's not talking about taking or keeping. It's just taking. And it has no issue of whether or not the person knows that the property was taken. The Nevada statute goes well beyond that California robbery statute to include keeping, not just taking, and also doing it in such a way that the person doesn't even know that the property was kept so long as that knowledge is a result of force or fear. I don't know if the Court has any ---- I'm sorry. I'll say that again, maybe a little more clearly. Under the California statute, what Becero Lopez said, that's a categorical match, okay? It just prescribes taking by force or fear. That's the California statute. And the Nevada statute is different because? It allows ---- it prescribes taking or, and it's right in the statute, it's the disjunctive, taking or retaining, and it allows, and I'm guessing because some defendant appealed the conviction and then the legislature amended it, keeping property that the person doesn't even know they've been divested of so long as that knowledge was a result of force or fear. That particular ---- So long as that lack of knowledge? So long as the fact that they don't know that something was taken. I think a more relatable example would be somebody gets forced into a closet by force and then all their stuff gets taken. They might not ---- So you use it, so long as the knowledge, and I'm thinking what you meant to say was so long as their lack of knowledge. That's what I meant, Your Honor, yes. So long as that lack of knowledge. That's simply outside the scope of common law extortion. You cannot extort someone of property that they're not aware they've turned over. It says with their consent. I mean, you just can't extort. Real quick, to the extent that the Court is concerned with the fact that Edling did not address the deadly weapon enhancement, my day job is as a trial lawyer in the rough-and-tumble Nevada State courts. I assure Your Honors, everything in the Nevada State court is a deadly weapon. And I'm not speaking out of school. Rodriguez v. State, Nevada Supreme Court, 407 Pacific III, says virtually any object can constitute a deadly weapon. State v. Kippy Glover, K-I-P-P-Y, it's the most recent buzz in the county courthouse there, they charged up a can of pumpkin mix as a deadly weapon. So under the 193.165, the State statute, it's not a separate offense. It's a deadly weapon enhancement. It's a sentence enhancer. It doesn't change our categorical approach to its match to extortion. Kennedy, I can see mince cake, maybe, but pumpkin does seem to me a bit of a stretch. It's also been a pebble and an air pump. But I like pumpkin mix. It's a real... I'm sorry. Do you want to talk about the Peyton-Harris? Okay. ACCA was big, so I wanted to hit that first. Now, no one in here disagrees that there was a Peyton violation. So we're just going to... The government's position is kind of no harm, no foul. There was no actual search that occurred before the warrant was obtained. And there's a mix amongst the cases. Nora, there was arrested in the home or forced out at gunpoint, and then there was a pat-down. And then there was a confession with the stuff that was found in the pat-down. With Shetler, there was a guy who confessed in his yard while there was a warrantless search going on in the house. But then there's Harris, which the government really relies on here is Harrison Crawford. Why? Because they were arrested in the home, which is a Peyton violation, but the confession was... Isn't that what happened here? Here's the... Here's where... Here's where the court... Here's where... Here's where we determine if we can have a bright-line rule, frankly. He was arrested in his backyard. He was pulled through the house. Then he was put not in a station or an FBI office like Harrison Crawford. He was put in a patrol car outside the house within view of the house. Was there a warrantless search as a technical matter? What happened is, although the premises were frozen and the evidence shows that the gun was in plain sight in the bedroom, CSA analysts are actually going into the house in plain view of Mr. Cooper. The CSA analysts are going into the house with the alleged domestic violence victim in this case. They're walking in. Then, after they walked into the house where this gun was in plain sight, the detective comes and gets in the patrol car in full view of the house, says... Gets a confession out of him about, oh, I touched the gun and et cetera. So, is it Harrison Crawford? No, he was outside of the house. So, is it Harrison Crawford? No, because he's not from a remote location. So, this is where we... They were told there was a gun, weren't they? So, they were told by the domestic violence victim that there was a gun. No one disputes that the resultant felony arrest, which was three hours later when he was passed out in his backyard, that was an illegal arrest. It was a violation of patent. His confession thereafter came, okay, not on his curtilage, but right over the sidewalk into a patrol car. He's looking at the house. And this is where this Court has asked the question before... But what... I don't see what... If it's supposed they drove him down the street so he could no longer look at the house. I thought that the original call to the police indicated that there was a gun in the house. So, they would have asked him about a gun. He did not... Regardless of where... He was not... I'm sorry, Your Honor. ...where they were. Mr. So, here's what it comes down to. And this Court has asked this question before. Was silence perceived to be futile by the defendant? The defendant is not privy to what was on the 911 call. What he was privy to was he's arrested in his home and pulled outside. He watches crime scene analysts go into the house, and then he's asked about a gun. Was his silence perceived to be futile at that point when he then gives a confession saying I touched the gun? The difference between him being there and down the street is he watched officers go into his house where he knew the gun was in plain sight. He didn't know what was in the 911 call. What information does Cooper have? Well, there they go into my house, and then they come out, and now they're asking me about a gun. Give us your best shot of how you would articulate the rule that you think we ought to decide. I think the rule would have to be close to the premises such that the what could the government comes up and says there wasn't a search, but they went into the house. The rule would be would silence be perceived to be futile because although you're not on your property, you're in plain view of the house, and you're watching police go into your house. So is it close enough to the property such that it's you're still constructively home? And I'll add one little tidbit. When the detective got the confession from Mr. Cooper, on his tape recorder, he said I'm at such and such an address. That's where he said the location of the confession was. Even the detective said we're at the address, and then he saw the house. So the rule would be probably is the house in view, and does the defendant see individual officers? We're used to dealing with curtilages and with kind of discreet boundaries, and you're now suggesting that we adopt a very amorphous standard of psychological boundary. Let's not worry about the physical boundaries, but when is he psychologically bound to the house? And I guess you're suggesting that is while he's within view of it, and then maybe it's while he's three blocks away but can see cops running towards the house. I mean, there's a lot of potential for mischief once we kind of go past the boundaries and start looking at the virtual boundaries. So the purpose behind Peyton was to protect the sanctity of the home. I would say running toward the house probably wouldn't pass muster. Watching the detectives go in your front door, I mean, imagine the mischief on the other side if the court went the other way. Cops illegally arrest someone in violation of Peyton, pull them across the property line, walk into their house, oh, we're not doing a search, we're taking pictures of the victim, and now they can come out and question this defendant, oh, but we pulled them over the property line and we didn't search. Well, does that comport with Peyton's protection of the home when the guy's standing there watching them go in and come out, and then they say, all right, what? Let me make sure, because I didn't quite get this argument from the briefs, but you didn't write them. So your argument is that this is a Peyton case because they were outside the house. Yes. In effect, this is a search of the house instead of a questioning of somebody outside the house. Well, under Harris, which was an extension of Peyton, there was no search. It was an arrest in the house and then there was a confession. The confession at the police station was allowed in. The confession that they got at the house was suppressed. But there was no attendant search. A confession that is attenuated or closely related to an illegal arrest inside of a house, those confessions get suppressed. And it's a matter of are we comfortable with allowing officers to cross a bright line rule of, well, here's where the county said the property line ends, put you here, and now we can fuss around with your personal property, and any confession you give us can't possibly be related to our arrest of you in your home and walking in and out of your house because we pulled you over the county property line. Now, I understand the bright line rule was search. If they're searching outside the curtilage, trash cans, et cetera, there's a bright line rule there because it's where the property is. But if the guy whose interests are at stake, the sanctity of the home under Payton, is watching the non-search entry of officers into the house where there's a gun in plain sight and then they come out and they start asking about a gun. So do you have cases that say that the sanctity of the house depends upon it being observed by the owner? I do not, Your Honor, other than the fact that Nora, for example, was in the house outside of the house, okay, but he was still on the curtilage. So I guess if the court were inclined to draw a bright line rule, it would just have to be are you on the property line or not, even if you're still within the constructive area of the house. And even the detective. Was the officer's car on his property at the time? It was not, Your Honor. It was not in the driveway. It was out on the street. It was on the street, Your Honor. Okay, I'll take that last 90 seconds. I'm going to take it. You want to reserve your time there. Thank you. Good morning. May it please the Court. Elizabeth White for the United States. I'll take the issues in the same order, starting with the Nevada robbery, robbery with use of a deadly weapon is what that was. And first of all, I commend my opponent here for coming up with these wonderful arguments here at Oral Argument for the very first time about the second and third sentences of the 1983 version of Nevada robbery. None of these were briefed. And as the Court, you know, as you probably know, Mr. Cooper was quite adamant about doing his brief himself, and he had the meeting with Commissioner Shaw about it, Commissioner Shaw recommended against, because he said, there are some real issues here that need briefing. And he filed objections saying, no, no, no, I can do this myself. I'll comply with all the rules. So this Court reversed the commissioner and let him do his own brief. And then after he saw his briefings, allowed a Federal Defender's Office in Arizona to actually brief the robbery question and made the arguments, and I had an opportunity to file a responsive brief to those arguments, these arguments that are being made today are entirely different from anything that I've had an opportunity to respond to. So I just want that to be clear. But in fact, in response, first of all, to your question about how Edling applies to this case, you know, my response is that it really doesn't. The decision in Edling was specifically about the fact that the panel interpreted the 2016 amendment to the guidelines that changed the definition of extortion to exclude extortionate threats to property. So what used to be generic robbery, the guidelines extortion used to be generic extortion, and now it is not generic extortion. But the ACCA extortion is still generic extortion. And so the question when you're looking at Nevada robbery with use of a deadly weapon is, in terms of whether it's a violent felony under the ACCA, the first question which we think about in terms of whether it's categorical, whether it's a categorical match, but that question is really, is it overbroad, right? I mean, is there a way that you can violate this statute that does not fall within a definition of violent felony? And so what this court, and this is in the guidelines context before the 2016 amendments, looking at Nevada robbery and the guidelines, said, well, it doesn't qualify as generic robbery because it applies to threats to property. But if it's threats to property, that's extortion. So there's no way that you can violate Nevada's robbery statute without either committing generic extortion or generic robbery. That's what Harris said. The ACCA doesn't have generic robbery. It does have generic extortion, right? And so what we're left with is basically the same question we had in Dixon with the California robbery statute, right? There's two differences here. We're talking about robbery with the use of a deadly weapon, and we're talking about Nevada robbery. Is there a way to violate the statute, Nevada robbery with the use of a deadly weapon that does not either qualify as generic extortion or have as an element the use, threatened use, or attempted use of physical force against the person of another, right? And if there's no way that you can violate that statute without doing one of those two things, then it qualifies. And in this case, it does. I mean, to be convicted of robbery with the use of a deadly weapon, the criminal objective, it has to be intentional use of the deadly weapon. Now, I don't all of the – I also don't know these cases that he's citing to the court today. I don't recall getting any 28-J letters. But to the extent that there was a can of pumpkin mix that was used, my guess is the person had their – I think he was speaking rhetorically. Yes. Well, and if there was, you know, you get your – if you get your head bashed in with a can of pumpkin mix, you know, that can be used. Nevada defines deadly weapon as any item that is, when used as intended, would cause deadly force, which is like a gun or a knife, or anything which, given the way it is used, could cause deadly force or deadly injury or force. And so, yes, there's a lot of items that we wouldn't think of as inherently deadly weapons, but those wouldn't be deadly weapons under Nevada law unless the way they are being used is in such a way that could cause substantial bodily harm or death. So, under Nevada law, with robbery with a deadly weapon, the use of the deadly weapon has to be proven beyond a reasonable doubt to the jury, so it is an element of the offense. The use has to be intentional. And the use of the deadly weapon in the commission of the crime necessarily demonstrates that force is either attempted or threatened through the use of the deadly weapon. That is what this Court has said in analyzing a number of various state statutes that involve use of a deadly weapon. This Court says, you know, once you put a deadly weapon into the mix, you're changing things, right? I mean, even, you know, what the Court said in Camacho Cruz is assault with a deadly weapon under Nevada statute necessarily entails threatened use of force against the person, even though assault, you know, could be violated with any offensive touching. Once you are using a deadly weapon in conscious furtherance of that crime, you know, now you are at least threatening force.  Well, the district court, the district court held that this was not a violent felony. And would you explain to me why the district court, how the district court went along? Well, the district court was primarily, really was focusing on the, that it can be committed by threats of violence against property. And then, but then she didn't. I thought she also said that it wasn't extortion. Yes. And then, but then she said that it couldn't be, that if it's against property, it's not robbery. I mean, it's, you know, that goes beyond the first clause. The first clause is broader. And extortion, generic extortion requires taking someone's property with their consent, whereas robbery requires taking someone's property without their consent. But this court in Bessara-Lopez, I mean, as early as Bessara-Lopez, explained that those two things are not inconsistent because, let's see, because the with consent element of generic extortion is not inconsistent with the against the will element of, in that case, California robbery, but it's the same. Because both crimes equally require that the defendant's threat induce the victim to give up his property, something which he would not otherwise have done. So this court in Bessara-Lopez, and then actually just reiterated that in Chavez-Cuevas in 2017, citing Bessara-Lopez, the Federal Public Defender's Office that did the amicus brief actually cited two cases saying that extortion has to be with the person's consent. But in fact, in both of those cases, it's this Court explaining that they don't really have to be. It's tantamount to without consent. Yes. And that is what this Court has said. And that's really what the district court kind of hung her hat on. And it is just, you know, it is just contrary to this Court's law. Now, I will say that in Dixon, which was yet another of my cases, this Court found that the California robbery statute did not qualify as a violent felony under the ACCA. And there are two differences there. One, that was unarmed robbery. This is robbery with the intentional use of a deadly weapon in furtherance of the offense. And second of all, it does come down to, you know, when you're trying to interpret these state statutes, you have to look at state decisional law. And in Dixon, the panel interpreted a, they found a California Supreme Court decision, which they interpreted as suggesting that you could commit a robbery through the accidental use of force. On the one hand, first of all, there's no, I'm not aware of any such Nevada case that would hold that with respect to Nevada robbery. But in any event, the Nevada robbery with the use of a deadly weapon requires the use of a deadly weapon in conscious furtherance of the crime. So I think that resolves that. Let's see. This is also, I did cite some other cases. It does seem that most of the circuits agree once you're talking about a deadly weapon. And then, as I pointed out in the brief, this is obviously distinguishable from the cases like Parnell and Giosos, where this Court has said it doesn't qualify as a crime of violence. If a robbery becomes armed robbery, purely by virtue of the fact that the defendant has a weapon while he commits the crime, even if it's something in his back pocket that the victim never sees and never has anything to do with. The Massachusetts armed robbery statute allows for that. The Florida does. In those cases, the fact that somebody had a weapon, if it didn't play any role, if the victim wasn't aware of it, you just don't have that same concern. But in Nevada, that actually does not qualify. The weapon has to be used. And then, just one point. There's also, there are two battery with use of a deadly weapon. And the third one was the, I'm sorry, robbery with use of a deadly weapon. The third violent felony was Nevada battery with substantial bodily harm. The Court didn't address that one, because once she decided that the robberies didn't count, she didn't need to. But I would just say, I cite a number of cases, and I actually think that the Lawrence decision, which I cite in the government's brief, is really the most on point. Although that case was about assault resulting in substantial bodily harm, if you look at the analysis that this Court did, they looked at and the one that they were really focusing on was the one that was essentially battery. So, I think that that really goes in together. Payton, the issue, what the Supreme Court said in Harris, is that the rule in Payton was designed to protect the physical integrity of the house. Right? I mean, that the harm in allowing officers to go into your house to arrest you on a routine felony arrest, where they have probable cause, they absolutely have probable cause to arrest, but to let them go into your house to do that, that intrudes on the physical integrity of your home. And so, as a result, if they do that without an arrest warrant, anything they see there, anything you say there, that is excluded, because that is the exclusionary rule bars the use of anything that came as a result. No, actually no. And I think that Nora is really the best example of this. Because in Nora, they surrounded the house with bullhorns and guns and said, come out right now. So he came out. And what the Court said was, well, when you're ordered out with guns and bullhorns, you don't have time to compose yourself and maybe check your pockets and leave stuff, you know? Right? So he comes out and they find, I think they found bullets in his pocket. And then once they found the bullets, then he confessed. And he's outside the house. I don't know if he was on the cartilage or not, but I don't think it would have mattered whether he was on the cartilage or not. Because the question was, the search, the discovery of the bullets as part of the search was because of the intrusion into the house. You know, they said it was sort of a virtual intrusion into the physical integrity of the house when they ordered him out at gunpoint. So even though that happened outside the house, it was an unlawful search, and the confession that he made was a fruit of that unlawful search. I am confused. Let me ask you how you would articulate the test when interrogation is out of the house. When do you think the nexus is close enough that we have Harris, and when isn't it? I would say, I would use the exact language that the Court used in Harris, which is that what has to be excluded is anything incriminating that the police gathered as a result of the fact that they arrested the defendant in his home rather than somewhere else. So, you know, because in Nora they were deemed to have sort of virtually arrested in his home, and they searched his pockets and the pockets had bullets because when you're in your house, you can have bullets in your pocket, right? And so because of that, if they had arrested him on the street, you know, maybe he would have thought a little bit better. Maybe he would have left the bullets on the dining room table, right? So it was because they intruded into the physical integrity of his home. And so you would say that with that test, if instead of then doing the subsequent interrogation in his yard or in the police station, I mean in the car, your test would say that could exclude evidence all the way down to the police station when they find the bullets in his pants. And he says, well, they wouldn't have been in my pants if you hadn't been arresting me in my house. Absolutely. Yeah. No, absolutely. I think that if they order him out of his house And he has to get out. He's got his bathrobe on, and they order him in the house. And he says, gee, I never would have come out to the police station in my bathrobe and sure there were drugs in the pocket of my bathrobe. You would say that Harris would exclude that even if it wasn't discovered until they were down at the precinct station. I think that's the analysis, because it's about did the police obtain information by virtue of the fact that they chose to arrest him in his home rather than arrest him somewhere else. But in the example Mr. Hill raised, you would say if he is now out of the house being interrogated and he's just nervous and anxious because they see police coming in and out of the house, that doesn't meet the test. No, it wouldn't. And I'll tell you exactly why I don't think that, because say, and first of all, there was a lot of litigation about whether there was anything wrong with the CSI folks going in with the victim. They went inside to take pictures of her injuries, because it was 4 o'clock in the morning. There was no light outside. So there was nothing wrong with, to the extent that there were some people that went in before the search warrant was obtained, and then he made these statements before the search warrant was obtained. But regardless of that, I would say, here's an example. If somebody is, police have probable cause to arrest someone, and so they wait outside his house for him to come home. And as he's walking down the street, they arrest him, and they put him in a patrol car right across the street from his house. And they've got some reason that the roommate's letting them into the house to check on the dogs or take pictures of the injuries or whatever. And he's making these statements. Whatever he says, because he's nervous that he sees police officers going in and out of his house, has nothing to do with where they arrested him. Right? I mean, the fact that they arrested him in his backyard, as opposed to walking down the street, has nothing to do with, I mean, him being held in a patrol car across the street while he's being questioned and while they're doing their investigation has nothing to do with the Payton violation. I mean, it has nothing to do with the fact that they arrested him at his home rather than someplace else. And that's what the Supreme Court said in Harris. The question is, was information obtained because the arrest took place in the home as opposed to somewhere else? And if they had arrested him outside the home and done the exact same thing, they wouldn't have gotten anything. Now, if when they went into the backyard to arrest him, the shotgun was, you know, on the other side in the kitchen leaning up against the refrigerator and they could see it. I mean, if the gun was in plain view and they saw that when they were in the backyard, which they weren't supposed to be because they didn't have an arrest warrant, then the gun would have to be suppressed. I mean, then that plain view you know, plain view is when you are somewhere where you are entitled to be. And if you go into the backyard without an arrest warrant to arrest somebody, whatever you see there, whatever he says there, you know, that's excluded because you weren't supposed to be there. And that's the – I think that's why. At least that's how you harmonize Payton and Harris. Yeah. I think the – and the other thing, I mean, if you want any supplemental briefing on these new armed robbery arguments, I'd be happy to do that. But I would point out, and I think that Your Honor made a very good point with Duenas-Alvarez and Moncrief, right? I mean, the Court says you can look at a statute and you can come up with some hypothetical of a way that it could conceivably be violated that wouldn't qualify. But the categorical approach is not an invitation to imagination, I think, is what the Supreme Court said. You have to be able to point either to your own – your case or your own case, and in some sense find a case where it was – where the crime was actually committed in a non-comporting way. And I don't think that that has happened here. And you have about 28 seconds, but you don't have to use it. Yeah. No. Unless you have any questions, I think I'm done. Thank you. Thank you. No questions. Can I have her time, Your Honors? Your Honor, I apologize to the Court for running roughshod over Mr. Cooper's brief. There's a real – you know, the government has always been good to me, or at least this government representative, this representative of the government. The reason I – first of all, in all fairness, the amicus brief talks about the breadth of the robbery statute. So from the 30,000-foot view – but as a result, the reason I really delved into that statute is because on remand for resentencing, if this Court reverses the district court, he's looking at a – Mr. Cooper is looking at a 225 percent increase in his sentence. It's a really serious issue. So you don't have to indulge in my vivid imagination. You just have to put the Nevada robbery statute next to the common law extortion. I mean, James Joyce could have written that Nevada robbery statute. It's got so many means of criminal liability that it most assuredly put one side – one statute next to the other. Most assuredly, the robbery statute is more broad. In terms of the Payton issue, the one thing I wanted to seize on that the government said is whatever he says there should be thrown out. And I just would caution the Court, or I'm concerned, about drawing a rule where the officers can make the illegal arrest, pull them over the property line, and now suddenly that magically renders any confession admissible. And with that, Your Honor, I'll submit. Thank you, counsel. The case just argued is submitted for decision. The Court appreciates the arguments presented by counsel in this case. And that concludes the Court's calendar for today. The Court stands adjourned.
judges: Ebel, Schroeder, Gould